Jerry HENDERSON and Dejerilyn Henderson, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Charles GRADDICK, individually and in his official capacity as Attorney General of Alabama; John Baker, in his official capacity as Chairman of the Alabama State Democratic Executive Committee; and the Alabama State Democratic Executive Committee, Defendants.

Civ. A. No. 86–H–680–N.

United States District Court, M.D. Alabama, N.D.

Aug. 1, 1986.

Motions for Emergency Relief and Reconsideration Denied Aug. 26, 1986.

Ira A. Burnim, Deborah A. Ellis, Montgomery, Ala., Ralph I. Knowles, Jr., Jack Drake, Drake, Knowles & Pierce, Tuscaloosa, Ala., Neil Bradley, Atlanta, Ga., for plaintiffs.

Hamilton P. Fox, III, Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D.C., Champ Lyons, Jr., Coale, Helmsing, Lyons & Sims, P.A., Mobile, Ala., Robert E. Sasser, Jones, Murray & Stewart, P.C., J. Anthony McLain, McLain & Hampton, Montgomery, Ala., Walter J. Sears, III, Bradley, Arant, Rose & White, Birmingham, Ala., for defendant Graddick.

Joseph C. Espy, III, Melton & Espy, Montgomery, Ala., for defendants Baker and Alabama State Democratic Executive Committee.

Before JOHNSON, Circuit Judge, and HOBBS and MYRON H. THOMPSON, District Judges.

## MEMORANDUM OPINION

PER CURIAM:

Plaintiffs are black citizens of Alabama who voted in both the Democratic primary on June 3, 1986 and the Democratic gubernatorial runoff on June 24, 1986. They seek to represent a class composed of all black registered voters who voted in both of these elections. The Court is satisfied that the prerequisites for a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure are present, and, therefore, the action may proceed accordingly.

On behalf of themselves and the class they represent, plaintiffs contend that Charles Graddick, Attorney General of Alabama and a candidate for the Democratic Party's nomination for governor, attempted to administer and did in fact effect a change in the conduct of the June 24 runoff in violation of Section 5 of the Voting Rights Act of 1965 by using his office to advise voters they could vote in the Democratic runoff in violation of Democratic Party rules even though they had voted in the June 3 Republican primary and by preventing the Democratic Party from enforcing its rule prohibiting such "crossover" voting by threatening election officials with civil and criminal penalties if they attempted to prohibit crossover voting.

This Court concludes that Attorney General Graddick did violate the Voting Rights Act by this conduct, and he will therefore be enjoined from interfering with the operation of Art. VII, Section 1, subsection (e) of the Democratic Party of Alabama's rules. The Court will further direct that the Democratic Party of Alabama shall not certify Charles Graddick as its nominee unless he is successful in another runoff election at which those persons who voted in the June 3 Republican primary are excluded.

The Court has jurisdiction of this case pursuant to Section 5 of the Voting Rights Act (42 U.S.C. § 1973(c)) and is properly convened pursuant to 28 U.S.C. § 2284.

### Background of the Challenged Election

The Democratic primary of June 3, 1986 had a number of candidates for the party's gubernatorial nomination. Because no candidate received a majority of the votes in the June 3 Democratic primary, a runoff election was held on June 24 between the two candidates having the most votes: Lt. Governor William Baxley and Attorney General Charles Graddick. The rematch proved to be the closest in Alabama history, with Attorney General Graddick winning by only 8,756 votes of nearly a million cast.

Alabama law expressly provides that each party shall "determine who shall be entitled and qualified to vote" in the party's primary elections. Ala. Code § 17–16–14 (1975). Pursuant to this statutory authority, on April 21, 1979 the Alabama Democratic Party adopted as a part of its governing rules Article VII, § 1(e), which provides in relevant part:

Any person who (1) votes in any primary election of another political party, (2) par-

ticipates in the nominating process of another party's candidate(s), or (3) promotes the candidacy of an independent candidate, shall not be entitled to vote in Primary Elections of the Democratic Party held in the calendar year in which such person does any of said prohibited act(s). *Without limiting the foregoing, any person who votes in the first primary election of another political party shall not be entitled to vote in the Democratic Party's run-off Primary Election which follows such first primary election.* (Emphasis added)

According to a former Executive Director of the Democratic Party, Ms. Lindblom, the Party adopted the anti-crossover rule as a result of some concerns caused by the Republican Party's first use of statewide primaries in 1978. (See Lindblom depo., pp. 12–13). In the 1978 primaries, persons who had voted in the Republican primary had then voted in the same primary for Democratic nominees or voted in the Democratic runoff after having voted in the Republican primary. Obviously, the Democratic Party has a legitimate concern about the possibility of "raiding;" which occurs, for example, when supporters of another political party choose their party's nominee and then help to name the nominee of the Democratic Party by voting for the weaker Democratic candidate. *See Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). The 1979 anti-crossover rule was a response to this concern, and made absolutely clear that persons who voted in a Republican primary could not thereafter vote in a Democratic runoff following such primary election.

After the anti-crossover rule was adopted, the Democratic Party had ten thousand copies of the rule printed and widely distributed throughout the state to probate judges, Democratic Committee members, officeholders generally, and to the news media. The rule was also a subject discussed on television talk shows in elections in 1980, 1982 and 1984, and was the subject of work shops in various areas of the state prior to those elections. Ms. Lindblom testified that the Democratic Party's position has been consistently the same since the rule's adoption in 1979.

Section 5 of the Voting Rights Act required that the Democratic Party's anti-crossover rule be submitted for approval to the Attorney General of the United States or to a three judge court in the District of Columbia prior to its implementation. The United States Attorney General or the District of Columbia court then had the responsibility of determining whether the change in the law brought about by the new rule had the purpose or effect of denying or abridging the right to vote on account of race. Pursuant to Section 5's commands, this rule was submitted to the Attorney General of the United States and was approved, i.e., "precleared" by him in 1980 for enforcement as a valid, nondiscriminatory provision of Alabama law. That rule is thus enforceable and may not be modified or voided without first obtaining approval in either of the two fashions noted.

There have been two statewide Democratic Party runoffs since the rule was precleared by the U.S. Attorney General—in 1982 and 1984. No challenge was made by either the Democratic Party or a losing candidate to crossover votes in those runoffs. Mr. Al LaPierre, Executive Director of the Alabama State Democratic Party, testified in his deposition that the Democratic Party had no need to take affirmative measures in 1982 and 1984 to prevent crossover voting because very few people voted in Republican primaries in those years and there was no general solicitation of crossover votes by Democratic candidates for statewide office. Mr. LaPierre's testimony is uncontradicted, and the newspaper clippings introduced into evidence by Mr. Graddick are further evidence that no one urged the legality of crossover voting on a statewide basis in the 1982 and 1984 elections. Hence, the Democratic Party had no need to take special measures in the years prior to 1986 to enforce its rule forbidding crossover voting.

Beginning in early 1986, Mr. LaPierre and Mr. John Baker, Chairman of the State Democratic Executive Committee, began receiving notice that in some areas of the state, particularly Montgomery, Huntsville and Birmingham, some Republican officials and candidates who were running for local offices were telling voters they would not lose their right to vote in a Democratic gubernatorial runoff by voting in the Republican primary. Mr. Baker along with others in the state Democratic Party felt that because these were localized incidents, the response should be on a local level. Accordingly, press conferences were held in the areas where crossover voting was being encouraged, and the Party rule was publicized in those areas.

As the June 3 primary drew near, the claims by some in these areas that crossover voting was permitted intensified. Mr. Baker considered filing a lawsuit to clarify the matter but abandoned the idea on advice of counsel that such a lawsuit might only exacerbate the problem and because no Montgomery County judge could take the case due to conflicts either of interest or scheduling. In any event, Mr. Baker thought the problem would best be handled by local Democratic Party officials giving further local publicity to the Party rule.

On June 2, 1986, the evening before the primary, a prominent reporter of the Alabama political scene broadcast on a Montgomery television station his editorial opinion that crossover voting was legal. Mr. Baker immediately tried to respond, but was not given an opportunity to present his rebuttal on the television station until June 11 or 12.

Soon after the June 3 primary, some Republican officials began encouraging crossover voting on a statewide basis. The state Democratic Party responded with press releases and press conferences and continued to publicize the Party rule prohibiting crossover voting.

On June 4, 1986, Baker mailed a letter to all Democratic Party County Chairs reminding them of the rule against crossover voting and recommending that the follow-ing procedure be used at the June 24 runoff:

1. Each voter should be asked, "Did you vote in the Republican Primary on June 3?"

2. If the answer is "Yes," they should not be allowed to vote in the Democratic Party Primary Runoff.

3. If the answer is "No," they should be allowed to vote.

4. If they refuse to answer, they should not be allowed to vote since they are refusing to comply with Democratic Party rules and procedure.

5. If a person who is disallowed to vote for refusal to answer insists upon voting in violation of state law and Democratic Party rules, they may vote a challenge ballot if they request to do so.

On June 9, 1986, Mr. Baker sent the same letter to all circuit clerks and registers in chancery. On June 17, 1986, Mr. Baker again reminded the County Chairs of the rule and the recommended procedures, and he enclosed signs to be placed at all voting places which stated the Party rule prohibiting crossover voting.

During the week before the June 24 runoff primary, public debate on the crossover voting issue grew even more intense. On the weekend of June 22–23, a series of political advertisements were aired on television in which four Republican state senators stated that crossover voting was legal.

Mr. Graddick, as a candidate was widely quoted in the major newspapers throughout the state on June 23, one day prior to the election, encouraging voters who had voted in the Republican primary to crossover and vote for him in the June 24 runoff. Mr. Graddick concedes that these statements attributed to him in the newspapers were substantially accurate.

On this same day when candidate Graddick was calling on those who had voted in the Republican primary to vote for him in the Democratic runoff, as Attorney General he had copies of a letter hand delivered to the state's election officials advising

them that the Democratic Party's anti-crossover rule was unconstitutional. These letters were written on state Attorney General's letterhead and were signed with Mr. Graddick's approval by Susan McKinney, chief of the voter fraud division of the Attorney General's office. These letters had the appearance of an official Attorney General's Opinion Letter warning election officials that any attempt to enforce the Party's rule against crossover voting could subject such officials "to civil liability under state and federal law."

After 5:00 p.m., on June 23, the eve of the runoff, a Mobile attorney, at the request of Graddick campaign officials, took a petition for a temporary restraining order to a state circuit judge in Mobile. The petition sought to enjoin any election official from enforcing the anti-crossover rule. No notice was given to any defendant, and the circuit judge declined to issue the restraining order. He did, however, issue an order admonishing "election officials and poll watchers that in the event they impair, impede or otherwise attempt to impair or impede the exercise of the right to vote by plaintiff or others similarly situated in reliance upon Rules and Directives of the Alabama Democratic Party, they do so at their peril and cannot escape personal liability for such conduct in the event that this court later determines that said Rules and Directives of the Alabama Democratic Party are invalid." This order was immediately circulated to the news media and to election officials by the Graddick campaign committee and by the Attorney General's office.[1]

Approximately thirty-three thousand persons voted in the June 3 Republican primary. After much time-consuming effort, plaintiffs have checked about seventy-eight percent of the names of voters in the June 3 Republican primary to determine whether they also voted in the June 24 Democratic runoff. Based on their findings to this point, plaintiffs project that more than 13,000 of the voters in the June 3 Republican primary also voted in the Democratic runoff election.[2] Mr. Graddick contends that the number is substantially less than 13,000, but concedes that there are a substantial number of signatures on the voting list which his supporters found to be illegible and were not counted.

It has been impossible for this Court to determine precisely how many crossover votes were cast, and of course it is impossible to know how many of these were cast for Mr. Graddick and how many for his opponent, Mr. Baxley. The best estimate, however, from experts who conducted voter polls prior to the June 24 election is that Mr. Graddick received between 84 and 88 percent of the crossover votes. Dr. Natalie Davis who has conducted voter surveys for many years, and even conducted such surveys for Attorney General Graddick in 1978 and 1982 testified that based on her poll prior to the runoff, Mr. Graddick would receive about 84 percent of the crossover votes and Mr. Baxley about 15 percent. Dr. Jerry Ingram, who is the director of the academic research unit at Auburn University in Montgomery and also conducts voter polls, testified that according to his survey taken prior to the runoff election, Mr. Graddick probably received closer to 88 percent of the Republican crossover votes. Defendant Graddick presented the testimony of Dr. James L. Powell to the effect that the statistical samples used by Drs. Davis and Ingram were so small that there would be a margin of error either way of approximately eight percent. With such a margin of error in an election as close as

---

1. The Chairman of the Democratic Party, Mr. Baker, also sought and obtained a court order in an Alabama circuit court on June 23. This order declared the party rule with respect to crossover votes valid, and this order directed election officials to enforce the rule.

2. No blame or censure is ascribed to these crossover voters for they were assured by the Attorney General of Alabama that they had a legal right to vote in both the Republican primary and the Democratic runoff. Through the news media, they were also advised that a circuit judge had threatened possible sanctions for any election official who sought to interfere with their voting.

this one, Dr. Powell was of the opinion that the data did not permit a reliable conclusion as to who would have won the runoff without the crossover votes. A fair evaluation of this evidence makes clear that there is a likelihood that the net crossover votes cast for Mr. Graddick exceeded his narrow margin of victory, and that he would not have been nominated except for the illegal crossover votes.[3]

Dr. Davis and Dr. Ingram further testified that an overwhelming percentage of blacks voted for Mr. Baxley in the Democratic June 3 primary and runoff. Dr. Davis placed the percentage of blacks voting for Mr. Baxley at more than 95 percent based on an examination of the vote results in predominately black boxes.

Plaintiffs contend, therefore, that the action of Attorney General Graddick in issuing directives to election officials warning them of civil and criminal sanctions which could befall those who attempted to enforce the Party rule diluted black voting strength and had "the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973.

### Nature of Inquiry for this Court

The role of this three judge court is sharply circumscribed to a three-part inquiry: (1) whether there was a change in the rules governing the Alabama Democratic Party's runoff that was subject to preclearance under Section 5 of the Voting Rights Act; (2) if so, whether the requirements of Section 5 were respected; and (3) if not, what permissible remedy is appropriate to cure that wrong. *Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3 74 L.Ed.2d 863 (1983); *United States v. Board of Supervisors of Warren County,* 429 U.S. 642, 645–47, 97 S.Ct. 833, 834–35, 51 L.Ed.2d 106 (1977) (per curiam); *Perkins v. Matthews,* 400 U.S. 379, 383–86, 91 S.Ct. 431, 434–35, 27 L.Ed.2d 476 (1971). Under the terms of the Voting Rights Act we are prohibited from deciding whether this change actually had a discriminatory purpose or effect vis-a-vis the potency of black political power. *E.g., NAACP v. Hampton County Election Commission,* 470 U.S. 166, 105 S.Ct. 1128, 1137, 84 L.Ed.2d 124 (1985). That question is reserved by the Act to the Attorney General of the United States or to a three judge court in the District of Columbia. *See, e.g., United States v. Board of Supervisors of Warren County,* 429 U.S. at 645–46, 97 S.Ct. at 834–35 (1977); *Perkins v. Matthews,* 400 U.S. at 383–86, 91 S.Ct. at 434–35 (1971).

### Graddick's Contentions

Mr. Graddick contends that for several reasons he was not effecting a change in the voting law nor was he urging voters to violate the law or do an illegal act when he encouraged those who had voted in the Republican primary to cross over and vote for him in the Democratic runoff and prevented the Democratic Party from enforcing its anti-crossover rule.

■ First, he contends in his deposition that the anti-crossover rule is unconstitutional because the United States Constitution gives everyone the right to vote, "in this country," who is qualified to vote. (Graddick depo. p. 36) This argument that the United States Constitution is violated by the anti-crossover rule is frivolous. State laws regulating crossover voting consistently have been upheld by the United States Supreme Court. *See Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). Because political parties are formed for political reasons and their goal is to promote its policies and philosophies of government, "constitutionally protected associational rights of its members are vitally essential to the candidate selection process." *Nader v. Schaffer,* 417 F.Supp. 837, 844 (D.Conn.) (three judge

---

**3.** Mr. Graddick recognized the possible effect of the Republican crossover votes when he stated at his victory celebration, "I think, ah, they really played a part, ah, I don't know how many Republicans crossed over but obviously, ah, 12,- 000 vote margin, they voted 30 something thousand in the, ah, on June the 3rd so obviously they made a difference and I want to tell 'em how much I appreciate it."

court), *aff'd*, 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976). *See also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982). In *Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), the Supreme Court struck down an Illinois law which prohibited a person from voting in the primary election of a political party if he had voted in the primary of any other party within the preceding twenty-three months. The opinion acknowledged, however, the legitimate state interest in preventing "raiding" and preserving the integrity of the primary electoral process. The Court struck down the Illinois law only because it held that the twenty-three month requirement was unnecessarily long. Clearly, the opinion approved a rule such as the Alabama rule which only forbids a voter from helping to name the nominee of two political parties in the same election. Indeed, a state law that interferes with a political party's attempts to control crossover voting is much more likely to violate the Constitution than a state statute preventing such crossover voting. *See, also Democratic Party of the United States v. Wisconsin*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); *Republican Party of State of Connecticut v. Tashjian*, 770 F.2d 265 (2d Cir.1985), *prob. juris. noted*, —— U.S. ——, 106 S.Ct. 783, 88 L.Ed.2d 762 (1986). Even one of the cases relied on in Mr. Graddick's pretrial brief concluded that although a political party could not constitutionally prohibit a person who voted in another party's primary in one election from voting in a later primary in an entirely different election, the party could prohibit a person from voting in two parties' primaries or runoffs in the same election. *Gordon v. Executive Committee of Democratic Party of City of Charleston*, 335 F.Supp. 166, 169 (D.S.C.1971). Mr. Graddick's claim that the Democratic rule violates the United States Constitution therefore has no merit.

Likewise, Mr. Graddick's contention that the anti-crossover rule violates the Alabama Constitution is without merit. The Alabama Constitution guarantees Alabama citizens the right to vote only in every election, not in every primary. Accordingly, Graddick relies not on the Alabama Constitution in support of his position, but on an attorney general's opinion issued by former Attorney General MacDonald Gallion.

Not only do such attorney general opinions not have the force or effect of law, *Hill Grocery Co. v. State*, 26 Ala.App. 302, 159 So. 269 (1935), that opinion has little relevance to the issues presented in this case. The Gallion opinion was written nine years before the Democratic Party adopted its anti-crossover rule pursuant to Alabama statute. Attorney General Gallion was asked to construe Title 17, Sec. 347, of the 1940 Alabama Code, which provided that a voter in a primary shall receive the official primary ballot of that political party "and no other." He construed *that* statute as prohibiting a voter from getting a ballot in two party elections on the same day, but not as a prohibition on a voter being allowed to vote in a runoff not held on the same day. Attorney General Gallion stated that to prohibit such a voter from voting in a runoff would have the effect of disenfranchising that person in the runoff election, and he continued: *"This office has no authority to disfranchise (sic) any person."* (Emphasis added)

There is no question here of the construction of an ambiguous statute. This anti-crossover rule was adopted by the Democratic Party pursuant to a statute which clearly authorizes political parties to determine who shall be entitled to vote in party primaries. This rule is not a rule formulated by the fiat of the Attorney General's office. This Alabama statute giving political parties the authority to choose their membership and to prescribe who can vote in their primaries has been the law in Alabama for at least half a century. *See* Code of Ala. Title 17, Sec. 347 (1940) (enacted in 1931).

■ Mr. Graddick also contends that because the Democratic Party and plaintiffs waited until after the June 3 primary to begin attempts to enforce the anti-cross-

over rule, they waived any right to enforcement. Although there is clear evidence that rebuts the claim of Mr. Graddick that the Democratic Party and its officials failed to publicize the rule prior to June 3, the argument is also specious because laches is not a defense to a Section 5 claim. *Dotson v. City of Indianola*, 514 F.Supp. 397 (N.D.Miss.1981), *aff'd* 456 U.S. 1002, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *see also United States v. County Comm'n, Hale County, Ala.*, 425 F.Supp. 433 (S.D. Ala.1976), *aff'd*, 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977).

█ The final argument of Mr. Graddick is that Section 5 requires preclearance of both the rule and any steps taken to enforce the rule. He argues that since the methods of enforcing the crossover rule had never been precleared pursuant to Section 5 and had never been enforced in the manner which the party officials sought its enforcement in the June 24 runoff, he was correct in seeking to get voters to violate the rule and using his office to threaten sanctions against election officials who sought to enforce the rule.

As to the contention that preclearance is required for both enactment and also for enforcement, we find absolutely no basis in the law or in logic supporting Mr. Graddick's assertion. He offers no precedent, and we were unable to find one supporting such a tortured, and illogical, reading of Section 5.[4] No court has ever imposed a requirement that both enactment and *subsequent* enforcement of an election rule requires preclearance. On the contrary, there are a number of reasons compelling the opposite conclusion.

The purpose of the Act was to ensure that any new rules be approved before being put into operation, but surely once precleared the law may be enforced as need be to effectuate the purpose of the Act. In crafting the Voting Rights Act Congress placed in balance two competing interests: on the one hand, it sought to ensure that no changes in election laws be put into operation unless first determined to have no malignant purpose or effect on the potency of minority votes; on the other hand, it recognized the need for "a rapid method of rendering a new state election law enforceable" so as to minimize the concededly intrusive effect of the Act on a traditional state prerogative. *Allen v. State Board of Elections*, 393 U.S. 544, 549, 89 S.Ct. 817, 823, 22 L.Ed.2d 1 (1969). When Congress said that no state shall enact "or seek to administer" any change in election laws without preclearance it sought by the quoted language to reach changes such as Mr. Graddick's which were attempted without formal revision of the rules.

Mr. Graddick's reading of the Voting Rights Act would make an already burdensome, statutory preclearance requirement impossible to administer. This case is an excellent example of why Mr. Graddick's reading of the statute is erroneous. For two elections after the rule was adopted and precleared, there were no major challenges to the rule. No state officials urged violation of the rule. No attorney general

---

**4.** Defendant Mr. Graddick offers two cases for this proposition; neither is apposite. The language he cites in *Zimmer v. McKeithen*, 485 F.2d 1297, 1302 n. 9 (5th Cir.1973) *(en banc)* is clearly, by its own acknowledgment, *obiter dictum*. Even if it is a holding, the phrase cited is merely a restatement of the language of the statute. There is nothing to suggest that that court would have applied Section 5 in the unusual fashion Mr. Graddick suggests.

The other case, *Hereford Independent School District v. Bell*, 454 F.Supp. 143, 144 (N.D.Tex. 1978) (three judge court), is based on a critically distinct, though sketchily set forth, set of facts. Congress had extended the Voting Rights Act to cover any changes in election laws of Texas coming after 1972, although the revised Act did not come into force until 1975. The political unit there changed its election rules after the "freezing date" in 1972, but before the Act technically took effect. The court used the "seek to administer" language to thwart a cagey attempt at an end-run around the Act by reaching the enforcement of the new rule. *Hereford* does not stand for the proposition that two separate preclearances are required; the court required preclearance of enforcement because it was unable to require it of enactment. Thus at best *Hereford* can be read to require preclearance of changes at *either* enactment or enforcement. In the case before us enactment has already been precleared; no more is required.

threatened election officials with sanctions if they enforced the rule. No court issued an order on election eve warning election officials as to civil and criminal penalties for enforcing the rule. To suggest that the new situation created by these acts brought about by Attorney General Graddick should have been anticipated and that a plan of enforcement to meet them should have been approved by the Attorney General of the United States does not stand scrutiny. A court-imposed requirement of this kind would accomplish no obvious advance of the first object we noted, while positively doing violence to the second. We think the far sounder construction of Section 5, and the one we adopt, is that which until today has been so evident no court has even been called upon to articulate: a promulgated election rule that has been precleared for enforcement, consistent with Section 5, may be henceforth enforced as necessary without first seeking preclearance of the decision to do so.

■ Moreover, Attorney General Graddick should know that even if voters had no warning that this rule would be enforced, that is no basis for his action in seeking to secure its violation. Even if the Democratic Party did need to take special measures to enforce the rule in the two elections prior to the 1986 runoff election but failed to do so, this would not mean that the law has been abandoned or has no force. Once a law has been precleared it may be enforced whenever violated, and any change in the law or any practice inconsistent with the law must itself be precleared or be a violation of Section 5.

■ We note also that during the entire time the crossover law remained on the books and allegedly unenforced, Mr. Graddick was the chief legal officer of the State of Alabama. As such we may assume that had there been any violation of the crossover rule of such magnitude that the outcome of an election might have been affected, Mr. Graddick would have taken steps, according to his constitutionally prescribed duty, to uphold that law by bringing an action to enforce this law; or if he really

believed the law to be unconstitutional, he would have undertaken to stop the acknowledged past efforts in prior elections to inform the electorate that crossover voting was forbidden. His failure to bring either of such actions suggests either that he was delinquent in the performance of his official duties, a conclusion that we would not draw, or that the law had not been previously "enforced" in the manner sought in the 1986 runoff election because there had been no appreciable violation of that law.

It is absolutely clear that as a candidate and, more importantly, as the Attorney General, Mr. Graddick made every effort to get voters to violate the anti-crossover rule. It appears that thousands of voters did violate the rule and affidavits and depositions admitted in evidence attest to the fact that the Attorney General was to a large degree successful in blocking election officials from attempting to enforce the rule. Since this rule was clearly authorized by Alabama statute and since the rule had been precleared by the Attorney General of the United States in 1980, we hold that the Attorney General's actions effected a change in the procedure with respect to voting. This change was not "precleared" as required by the Voting Rights Act. The Act has, therefore, been violated.

### Remedy for Section 5 Violation

■ Mr. Graddick argues that even if Section 5 of the Voting Rights Act was violated, the only permissible or appropriate relief for such a violation is prospective, and that this Court should at least allow the results of the June 24 runoff election to stand until the Attorney General of the United States has been given an opportunity to "preclear" Attorney General Graddick's action in changing the Party rule which had been precleared in 1980. But Attorney General Graddick has no authority to change a rule of the Democratic Party adopted by the Party pursuant to express grant of such authority by the Alabama Legislature. Moreover, the very use of the word "preclearance" in the con-

text of now submitting the actions of the Alabama Attorney General for such review is a misnomer, revealing the hollow nature of this claim. The law requires that changes in election rules be precleared. Unless there are unusual circumstances, changes may not be instituted now in the expectation of *post facto* ratification at some indeterminate future time. This requirement is premised on a very good reason. "Congress knew that some of the States covered by ... the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *South Carolina v. Katzenbach*, 383 U.S. 301, 335, 86 S.Ct. 803, 822, 15 L.Ed.2d 769 (1966). Without the preclearance requirement, a new discriminatory change could be devised and implemented as soon as a prior one was struck down, leaving plaintiffs to pursue rights ever retreating like a will-o'-the-wisp.

For the proposition that this Court should stay a remedy until the Attorney General can now seek "preclearance" for his actions, Mr. Graddick relies on *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). *Allen* was the first case in which the Supreme Court was called upon to decide the parameters of Section 5 of the Voting Rights Act. The Supreme Court disposed of three appeals from Mississippi and one from Virginia in its opinion in that case. One Mississippi case involved amendments to the Mississippi Code providing for the at large elections of county supervisors. The second involved an amendment to the Mississippi Code providing for the appointment rather than the election of county superintendents of education. The third involved a change in the requirements for independent candidates running in general elections. The Virginia case involved a change in the method allowed for writing in the names of any candidate by an illiterate voter. In the Virginia case, the Court noted: "As the election outcome would not have been changed had the disputed ballots been counted, appellants sought only prospective

relief." *Id.*, at 553, 89 S.Ct. at 825. No one suggested that the change in any of the four cases was procured as an aid to one of the candidates.

In all four of the cases in *Allen*, the question was whether the Voting Rights Act was applicable to the type of change involved in those cases. The three judge courts which had considered the question had ruled that Section 5 was not applicable because the changes did not affect voter registration or the manner in which elections were conducted. Although the Solicitor General argued that new elections should be ordered if the state did not promptly institute Section 5 proceedings, the Supreme Court declined because the Section 5 coverage questions in that case presented "complex issues of first impression—issues subject to rational disagreement." *Id.*, at 572, 89 S.Ct. at 835.

It has now been twenty years since the Voting Rights Act became law. The many cases construing it since *Allen* leave no room for doubt that Section 5 has been violated when the Attorney General of a state without any Section 5 preclearance sends out a letter and a court order to all election officials threatening them with civil and criminal sanctions if they attempt to enforce the precleared law and further incorrectly advises voters that they can cross over and vote in a runoff because such votes are legal.

In *Perkins v. Matthews*, 400 U.S. 379, 396, 91 S.Ct. 431, 440, 27 L.Ed.2d 476 (1971), decided only a year after *Allen*, the Supreme Court stated:

In *Allen* we declined a like invitation and gave that decision only prospective effect, primarily because the scope of § 5 coverage was then an issue of first impression and "subject to rational disagreement." That reasoning is inapplicable in this case since *Allen* was decided two months before the originally scheduled dates of the Canton elections.

In arguing for new elections, appellants emphasize the desire of Congress to ensure that States and subdivisions covered

by the Act not institute new laws with respect to voting that might have a racially discriminatory purpose or effect. On the basis of the legislative history, there is little question that Congress sought to achieve this goal by relying upon the voluntary submission by affected States and subdivisions of all changes in such laws before enforcing them. Failure of the affected governments to comply with the statutory requirement would nullify the entire scheme since the Department of Justice does not have the resources to police effectively all the States and subdivisions covered by the Act, see *Allen*, 393 U.S. at 556, [89 S.Ct. at 826], and since private suits seem unlikely to sufficiently supplement federal supervision. Moreover, based upon ample proof of repeated evasion of court decrees and of extended litigation designed to delay the implementation of federal constitutional rights, Congress expressly indicated its intention that the States and subdivisions, rather than citizens seeking to exercise their rights, bear the burden of delays in litigation. At the same time, we recognize that, in determining the appropriate remedy, other factors may be relevant, such as the nature of the changes complained of, and whether it was reasonably clear at the time of the election that the changes were covered by § 5.

In this case it is abundantly clear that any change in the anti-crossover rule had to be precleared pursuant to Section 5. To allow this election result to stand would reward the perpetrator who deliberately caused a violation of its provisions. This is surely inappropriate under *Allen* and *Perkins*. See also *Dotson v. City of Indianola*, 514 F.Supp. 397 (N.D.Miss.1981) (three judge court), *aff'd* 456 U.S. 1002, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). Moreover, this challenge under Section 5 is somewhat unique in that the challenge comes after a primary and prior to the general election. For this Court to stay its hand until the United States Attorney General has an opportunity to study the racial impact of Mr. Graddick's illegal actions, and do nothing

until after the general election would put the Court to a task similar to unscrambling an egg. The Democratic Party and the interested citizens of Alabama are entitled to have a nominee for the general election which is now only two months away; voters are entitled to know that such a nominee will be able to serve if elected.

Mr. Graddick also argues that this Court should not invalidate the results of the June 24 runoff because the Democratic Party leadership was silent about the anti-crossover rule until after the June 3 election, thereby "entrapping" persons to vote in the June 3 Republican primary who would otherwise not have done so. We have set out herein some of the efforts by the Democratic Party leadership to publicize this rule, but the person with a clear obligation to publicize the anti-crossover rule prior to the June 3 primary was the chief law enforcement officer of Alabama, Mr. Graddick. He and his staff must have known of the erroneous statements being made by some Republican candidates that crossover voting was legal. If he believed that the steps being taken to warn voters of the requirements relating to primary voting were ineffective, he had every right, if not a duty, to advise voters as to the law respecting primaries.

Even if the Court accepted Mr. Graddick's argument that it cannot be determined with certainty from the available data who would have won the Democratic runoff if no crossover votes had been cast, we would still not be prohibited from awarding plaintiffs retroactive relief. The relevant issue for the Court is not whether plaintiffs can prove that Mr. Graddick's violation in fact changed the outcome of the runoff, but only whether his actions "could have" affected the outcome.

For example, in *Coalition for Education in Dist. 1 v. Bd. of Education*, 370 F.Supp. 42, 47 (S.D.N.Y.), *aff'd*, 495 F.2d 1090 (2d Cir.1974), the court found that the voting irregularity in that case "could have altered the outcome." For that reason, a new election was ordered. Similarly, the

court in *Hamer v. Ely,* 410 F.2d 152 (5th Cir.), *cert. denied,* 396 U.S. 942, 90 S.Ct. 372, 24 L.Ed.2d 243 (1969) determined that an altered outcome sufficient to set aside an election should be found where there is a serious violation and close election. The court in *Griffin v. Burns,* 570 F.2d 1065, 1079–80 (1st Cir.1978), held that the effect of illegal votes does not have to be determined with mathematical certainty. Because the right to vote is so important, the possibility that the results of an election were changed as a result of illegal votes is enough to justify ordering a new election.

The June 24 runoff was so close, the number of illegal crossover voters so great, and Mr. Graddick's violation so flagrant, this Court cannot take the chance that Mr. Graddick received the Democratic nomination as a result of his illegal actions. Moreover, this Court has found no other case where the person who brought about the Section 5 violation was also a candidate who stood to benefit directly from his violation. In the usual case, the persons affected by a violation of Section 5 are innocent in any way of having caused the violation. But in this case, Mr. Graddick clearly stood to benefit directly from his violation. Accordingly, this Court will not indulge the possibility that Mr. Graddick would have won the runoff even had he not prohibited the Democratic Party from enforcing its rules. *See Hamer v. Ely,* 410 F.2d 152 (5th Cir.), *cert. denied,* 396 U.S. 942, 90 S.Ct. 372, 24 L.Ed.2d 243 (1969); *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill.1969).

Plaintiffs urge this Court to order the Democratic Party to purge the crossover votes, and according to plaintiffs' evidence this would result in the election of Mr. Baxley. The Court declines to grant this relief. This Court does not sit as a contest committee of the Democratic Party to determine the winner of the election. It sits only to vindicate the requirement of Section 5 that no change may be effected governing the rules for the conduct of elections unless such change is precleared pursuant to the commands of Section 5. We agree with the court in *Griffin v. Burns,* 431

F.Supp. 1361 (D.R.I.1977), *aff'd,* 570 F.2d 1065 (1978):

> "The electoral process ... must work fairly, and must be seen to have worked fairly—and worked by the people. There must not be any lurking suspicion that a court, and not the people, has somehow chosen a party nominee."

The remedy that this Court fashions for Mr. Graddick's violation of the Voting Rights Act is to instruct the Democratic Executive Committee not to certify Mr. Graddick as the Democratic gubernatorial nominee based on the June 24 runoff election. The Democratic Party is directed to order a new runoff election between Mr. Graddick and Mr. Baxley as soon as is reasonably practical unless the Democratic Party determines pursuant to its procedures and the stringent rules for a party contest under applicable Alabama law that Mr. Baxley is the legally elected nominee of the party based on its determination of which votes should be purged and for whom such votes were cast. If there is a second runoff election, no persons who voted in the Republican Party June 3 election may legally vote in such runoff and the procedures which the Democratic Party sought to implement at the June 24 runoff to enforce its anti-crossover rule shall be followed. Attorney General Graddick and his successors in office will be enjoined from seeking any change in the Democratic Party rule affecting crossover voting without following the procedures for effecting such change prescribed by Section 5 of the Voting Rights Act.

This Court will retain jurisdiction to issue such further orders as may be appropriate.

A separate order will be entered in accordance with this memorandum opinion.

## ORDER

In accordance with the memorandum opinion entered contemporaneously herewith, it is ORDERED, ADJUDGED and DECREED:

1. That a plaintiff class of all black, registered voters who voted in both the

June 3 Democratic primary and June 24 Democratic runoff is hereby certified.

2. That by preventing the Democratic Party of Alabama from enforcing its rule prohibiting crossover voting in the June 24, 1986 gubernatorial runoff and by actively encouraging the violation of the Democratic Party's anti-crossover rule without first receiving "preclearance" of such actions, defendant Charles Graddick violated Section 5 of the Voting Rights Act of 1965.

3. That defendant Charles Graddick and his successors are hereby enjoined from seeking to administer any change in the Democratic Party rule prohibiting crossover voting without following the procedures prescribed by Section 5 of the Voting Rights Act for effecting such a change.

4. That the Alabama State Democratic Executive Committee and John Baker are hereby enjoined from certifying Charles Graddick as the Democratic gubernatorial nominee based on the results of the June 24, 1986 Democratic runoff.

5. That the State Democratic Executive Committee and John Baker are mandatorily enjoined and directed to order a new runoff election between Mr. Graddick and Mr. Baxley unless the Democratic Party determines pursuant to its procedures and the stringent rules under Alabama law for an election contest that Mr. Baxley received the majority of the legally cast votes in the June 24 runoff.

6. That if a new runoff election is held, no person who voted in the June 3 Republican primary will be allowed to vote, and the following procedure will be used by all election officials to determine who shall be allowed to vote:

(1) Each voter shall be asked, "Did you vote in the Republican primary on June 3?"

(2) If the answer is "Yes," that person shall not be allowed to vote in the Democratic runoff.

(3) If the answer is "No," that person shall be allowed to vote.

(4) If the voter refuses to answer, he shall not be allowed to vote because he is refusing to comply with the rules of the Democratic Party.

(5) If a person who is not allowed to vote for refusal to answer insists upon voting in violation of state law and Democratic Party rules, he may vote a challenge ballot if requested.

This Court hereby retains jurisdiction of this case to award any further or other relief that is necessary. For the purpose of determining costs and attorney's fees, this cause is remanded to the one judge initiating district court.

## ON MOTIONS FOR EMERGENCY RELIEF AND RECONSIDERATION

### I

### PROCEDURAL HISTORY

Plaintiffs Jerry and Dejerilyn Henderson filed suit on behalf of themselves and all black citizens of Alabama who voted in both the Democratic primary on June 3, 1986 and the Democratic gubernatorial runoff on June 24, 1986. Plaintiffs sought relief under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, on the theory that Charles Graddick, the Attorney General of Alabama and apparent winner of the June 24 runoff, violated the Voting Rights Act by using his office to encourage crossover voting in the June 24 runoff. Crossover voting refers to the practice whereby persons voting in the June 3 Republican primary voted in the June 24 Democratic runoff.

Before plaintiffs filed this suit, both Mr. Baxley and Kenneth and Nellie Pike filed primary election contests of the June 24 runoff with the State Democratic Executive Committee ("SDEC") pursuant to Ala. Code § 17–16–71. John Baker, chairman of the SDEC, appointed a subcommittee to conduct the contest. Shortly thereafter, Mr. Graddick obtained a temporary restraining order from an Alabama circuit court enjoining the SDEC from holding hearings on the contest and forbidding Mr. Baxley from taking any discovery. The Alabama Supreme Court stayed the temporary restraining order and directed the cir-

cuit court to issue promptly a final order. The circuit court then held without any explanation that Mr. Graddick was the lawful winner of the June 24 runoff. The Alabama Supreme Court reversed, holding that Mr. Baxley's challenge was timely filed, that the hearings were timely commenced, that the SDEC was authorized to act through a subcommittee, and that the Democratic party had exclusive jurisdiction to hear the contest.

Subsequent to the Alabama Supreme Court's decision, after receiving and considering the evidence offered by all parties, this Court concluded that crossover voting constituted a change within the meaning of Section 5 which had not been precleared by either the Attorney General of the United States or the United States District Court for the District of Columbia. Accordingly, this Court entered an order on August 1, 1986 enjoining the Democratic Party from certifying Mr. Graddick as its gubernatorial nominee on the basis of the June 24 runoff. This Court also directed the Democratic Party to conduct another runoff election between Mr. Graddick and Mr. Baxley unless the Democratic Party determined in a primary election contest that Mr. Baxley received the majority of legal votes cast in the June 24 runoff.

After this Court issued its order, the subcommittee proceeded to hear the contest, and on August 15, 1986, the subcommittee held that Mr. Baxley received the majority of legally cast votes in the June 24 runoff. Mr. Graddick now petitions this Court for "emergency relief", requesting this Court to enjoin the SDEC from certifying Mr. Baxley as its nominee and to order a new runoff between the two. Because the Democratic Party has already certified Mr. Baxley as its gubernatorial nominee to the Alabama Secretary of State, Mr. Graddick further requests this Court to compel the Democratic Party to withdraw its certi-

fication of Mr. Baxley in addition to ordering a new runoff.

## II

### CONTENTIONS OF THE PARTIES

In his motion for emergency relief, Mr. Graddick makes the following arguments. First, he contends that Mr. Baxley failed to comply with the notice provisions of Ala. Code § 17–16–79 (1986).[1] At the contest hearing, Tom Fletcher, Mr. Baxley's campaign manager, testified that he had identified by name 10,406 crossover voters. Mr. Fletcher then extrapolated from his raw data and concluded that there were approximately 14,000 crossover voters. Mr. Graddick argues that Mr. Baxley supplied him the names of substantially fewer crossover voters prior to the hearing. Furthermore, Mr. Baxley never specified for whom each voter voted. Rather he stated merely that 88% of them voted for Mr. Graddick. Mr. Graddick contends that this does not constitute proper notice; therefore, the subcommittee could not have received any evidence concerning illegal votes and should have dismissed the contest.

Mr. Graddick argues also that the subcommittee improperly relied on polling data and surveys to find that Mr. Baxley received a majority of the legal votes cast. Instead, his argument states that the subcommittee needed a particularized showing of how each crossover voter voted; that the subcommittee should have made such a determination by questioning every crossover voter individually or by examining the challenged ballots; and that without such an inquiry the subcommittee could not have been certain how the crossover voters voted. He argues also that the statistical data was hearsay and was inadequate to establish that Mr. Baxley received the majority of the legal votes cast. Furthermore, he alleges that the subcommittee improperly

---

1. Ala.Code § 17–16–79 provides that:

No testimony shall be received of any illegal votes ... in any contest commenced under the provisions of this article unless the party complaining thereof has given to the adverse party notice in writing of the number of illegal votes and by whom given, for whom given and at what precinct or voting place cast ... which he expects to prove on the trial. Such notice shall be served ... at least five days before the taking of the testimony in reference to such votes.

relied on the malconduct of Graddick, acting in his capacity as the Alabama Attorney General, to lower the burden of proof.

For these reasons, Mr. Graddick contends that the subcommittee did not act in accordance with Alabama law. Therefore, the subcommittee failed to comply with the August 1 order and cannot certify Mr. Baxley as the Democratic nominee for governor.

Defendant Graddick also argues that the subcommittee's order violates the due process clause of the Fourteenth Amendment. He contends that both the right to vote and a candidate's access to the ballot are liberty interests; that the subcommittee could not certify Mr. Baxley as the nominee without at least clear and convincing evidence that he received a majority of the legal votes cast; and that the evidence before the subcommittee failed to satisfy this burden. He also asserts that the SDEC's failure to disqualify voters who previously supported an independent candidate violated due process and denied equal protection to Republican crossover voters.

Plaintiffs respond with the following arguments. First, they argue that the August 1 order merely enjoined the Democratic Party from certifying Mr. Graddick on the basis of the June 24 runoff and that it in no other way restricted the options available to the Democratic Party under Alabama law. Second, they assert that the Democratic Party had exclusive jurisdiction under both the Constitution and Alabama law to conduct the primary election contest. Next, plaintiffs assert that the Alabama election code permits the use of polling data in election contests, especially where it is not feasible to question individually every voter. They further contend that polling data is both legally admissible and reliable evidence. Finally, they assert that the SDEC correctly considered and treated Mr. Graddick's challenge of those voters who signed a petition for an individual who proposed to run as an independent.

The State Democratic Executive Committee adds that it scrupulously followed the Alabama election code and allowed Mr. Graddick ample opportunity to participate in the proceedings. In addition, it contends that the Alabama Supreme Court specifically determined the validity of this contest proceeding. The SDEC also asserts that the evidence presented to it was sufficient to demonstrate that Mr. Baxley received a majority of the legal votes in the June 24 runoff.

## III

## DISCUSSION

In our August 1 order, this Court directed the Democratic Party to conduct a new runoff election between Mr. Graddick and Mr. Baxley "unless the Democratic Party determines pursuant to its procedures and the stringent rules for a party contest under applicable Alabama law that Mr. Baxley is the legally elected nominee of the party based on its determination of which votes should be purged and for whom such votes were cast." The Democratic Party, acting through the SDEC and its lawfully appointed subcommittee, determined that Mr. Baxley received the majority of the legally cast votes and accordingly certified him as its gubernatorial nominee. Mr. Graddick now asks this Court to interpret legal issues concerning the Alabama election code, to make its own evaluation of the evidence before the contest committee, and to hold that the SDEC acted in violation of state law. Such a request misconceives this Court's limited authority under Section 5 of the Voting Rights Act and the nature of our remedial order. As a matter of fact, Mr. Graddick evidences a complete misunderstanding of the controlling legal principles and the application of those principles to the evidence presented in this case. Some of this lack of comprehension concerns basic portions of our August 1 opinion and order:

1. Alabama law expressly provides that each party shall "determine who shall be entitled and qualified to vote" in the party's primary elections. Ala.Code § 17–16–14 (1975).

2. Pursuant to this statute in April 1979 the Alabama Democratic Party adopted as a part of its rules Article VII, Sec. 1(e).

3. This rule explicitly provides that "... any person who votes in the first primary election of another political party shall not be entitled to vote in the Democratic Party's run-off Primary Election ..."

4. This rule was widely distributed throughout the State of Alabama to officeholders and the news media.

5. Section 5 of the Voting Rights Act of 1965 required that this crossover rule be submitted for the approval of the Attorney General of the United States or to a three judge court in the District of Columbia prior to its implementation.

6. The rule was submitted to the Attorney General and "precleared" by him in 1980 for enforcement as a valid provision of Alabama law.

7. The "precleared" rule could not be modified or voided by state officials without resubmission to the Attorney General of the United States or the United States District Court for the District of Columbia.

8. Soon after the June 3 primary, from which Mr. Graddick and Mr. Baxley emerged as the two leaders in the gubernatorial race, but neither with a majority, some Republican officials began encouraging crossover voting on a statewide basis.

9. Mr. Graddick, who was and is the Attorney General for the State of Alabama, publicly encouraged voters who had voted in the Republican primary on June 3 to cross over and vote for him in the Democratic runoff on June 24.

10. Mr. Graddick, as State Attorney General, had copies of a letter, written on State Attorney General's letterhead and signed by one of his assistants, hand delivered to the state's election officials. This letter advised that the Democratic Party's anti-crossover rule was unconstitutional. These letters had the appearance of an official Attorney General's opinion letter and warned election officials of possible civil liability under state and federal law.

11. This Court found in its August 1, 1986, order as a fact that "A fair evaluation of [the] evidence makes clear that there is a likelihood that the net crossover votes cast for Mr. Graddick exceeded his narrow margin ..." by which he led Mr. Baxley.

12. The anti-crossover rule did not violate the laws or the Constitution of Alabama.

13. The failure of this Court to take the action it did in the August 1 order would have rewarded the candidate who deliberately caused a violation of Section 5 of the Voting Rights Act.

14. The remedy fashioned by this Court in its August 1 order was the minimum necessary to correct an egregious violation of the Voting Rights Act.

■ Section 5 of the Voting Rights Act vests district courts with the authority to enjoin the use of non-precleared voting procedures in pending elections *and to correct their impact if the election has ended.* See, e.g., Connor v. Waller, 421 U.S. 656, 656–57, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (per curiam) (election conducted pursuant to court-ordered reapportionment plan); *Busbee v. Smith,* 549 F.Supp. 494, 522 (D.D.C.1982) (expedited election schedule). *See also Dotson v. Indianola,* 514 F.Supp. 397, 402 (N.D.Miss.1981) (recognizing tacit authority to void completed election).

■ However, the nature of a district court's remedial authority can be understood only in light of its function under the Voting Rights Act. As discussed in the August 1 order, the Voting Rights Act sharply circumscribes the role of three judge courts such as this. Such courts can decide only whether a change in election practice has occurred within the meaning of Section 5 and, if so, whether that change has been precleared. *United States v. Board of Supervisors of Warren County,* 429 U.S. 642, 645–47, 97 S.Ct. 833, 834–35, 51 L.Ed.2d 106 (1977) (per curiam); *Perkins v. Matthews,* 400 U.S. 379, 383–86, 91

S.Ct. 431, 434–35, 27 L.Ed.2d 476 (1971). They cannot even decide whether the change actually had a discriminatory purpose or effect. *See, e.g., NAACP v. Hampton County Election Commission,* 470 U.S. 166, 105 S.Ct. 1128, 1137, 84 L.Ed.2d 124 (1985); *Perkins v. Matthews,* 400 U.S. at 383–86, 91 S.Ct. at 434–35.

 A finding that a covered change in election procedures has not been precleared does not endow a district court with complete control over a state's electoral process. It would be anomalous if a three judge court asked to protect the rights of a minority class of citizens where the requirements of Section 5 were violated concluded that its powers extended to sitting as a court of appellate review to decide whether the SDEC violated state law or had made a ruling which was not fully supported by the evidence before such committee. Although three judge courts have broad remedial authority, massive intervention is to be avoided beyond the extent necessary to vindicate the requirements of the Voting Rights Act.

The August 1 order reflects the limits of this Court's power. When this Court determined that Mr. Graddick violated the Voting Rights Act, it properly undertook the least disruptive remedy it could to vindicate the plaintiffs' rights—enjoining the certification of Mr. Graddick on the basis of the June 24 runoff. Because this measure ensured that Mr. Graddick could not benefit from his illegal acts, this Court fulfilled its limited task under Section 5. Although this Court retained supervisory jurisdiction over its order, that authority was limited to ensuring that the Democratic Party did not improperly certify Mr. Graddick. It cannot be exercised for any other purpose.

 Contrary to Mr. Graddick's suggestion, the August 1 order did not make this Court a court of appellate review for decisions of the SDEC. Instead, it only denied the Democratic Party one option otherwise available to it under Alabama law and left otherwise untouched the authority of the SDEC under the laws of Alabama. Having fulfilled its obligations

under Section 5, this Court has no authority to determine whether the primary election contest conducted by the State Democratic Executive Committee complied with Alabama law or is unconstitutional.

Accordingly, defendant's motion for emergency relief will be denied.

### ORDER

Upon consideration of the memorandum opinion of this Court entered and filed this date and the opinion of this Court entered and filed on August 1, 1986, it is ORDERED that defendant Graddick's motion for emergency relief filed August 15, 1986, be and is hereby DENIED.

### ORDER

The motion of the defendant Charles Graddick for reconsideration of this Court's order and memorandum opinion of August 1, 1986, and to enter a new judgment in favor of Graddick is ORDERED to be and is hereby DENIED.