496 So.2d 688 (1986)
Ex parte William J. BAXLEY, et al.
(In re Charles A. GRADDICK v. John BAKER, etc., et al.)
Ex parte John BAKER, etc., et al.
(In re Charles A. GRADDICK v. John BAKER, etc., et al.)
William J. BAXLEY
v.
Charles A. GRADDICK.
John BAKER, etc., et al.
v.
Charles A. GRADDICK.
Charles Kennith PIKE and Nellie Kent Pike
v.
Charles A. GRADDICK.
85-1242, 85-1260 and 85-1308 to 85-1310.
Supreme Court of Alabama.
August 7, 1986.
*689 David Cromwell Johnson and Edward Still, Birmingham, for William J. Baxley.
Herman Watson and Michael L. Fees of Watson, Gammons & Fees, Huntsville, for Kennith and Nellie Pike.
Joe Espy, III, Montgomery, for John Baker, individually, and as Chairman of the State Democratic Executive Committee, William B. Blount, Jack Boggan, Franklin Kellett, John Knight, and the Alabama Democratic Party.
Champ Lyons, Jr., Mobile, and Hobart A. McWhorter, Jr., and Walter J. Sears, Birmingham, for Charles A. Graddick.
PER CURIAM.
In the June 24, 1986, Democratic run-off primary, Charles A. Graddick and William J. Baxley were the contending candidates for the Democratic nomination for Governor. On Saturday, June 28, John Baker, Chairman of the State Democratic Executive Committee (SDEC) announced the completion of the vote tally in the run-off primary election and that tally showed that Graddick was the winner by 8,756 votes. On or about noon on June 30, 1986, a subcommittee of the SDEC declared the results of the election at the State Capitol in Montgomery, according to Code 1975, § 17-16-35.
On or about 9:30 a.m. on July 1, 1986, Baxley filed a contest of the primary election with the SDEC pursuant to Code 1975, § 17-16-70. This contest alleged malconduct by Graddick and his campaign, conspiracy, and illegal votesall in violation of Code 1975, § 17-16-71(1), (3), and (5).
Before Baker announced the results of the tally on June 28, Kennith Pike and Nellie Pike, on that same day at 10:25 a.m., filed a contest of the election alleging that illegal votes had been cast.
In response to the contests, Baker appointed a subcommittee to hear and determine them.
On July 1, Graddick filed a motion with the SDEC to dismiss the contests. On July 14, 1986, the Democratic subcommittee held the first hearing on the Pike and Baxley contests, but did not rule on Graddick's motion to dismiss the contests. It set its next meeting for July 21, 1986, but that meeting was continued until July 28, 1986.
On July 24, Graddick filed a petition for a temporary restraining order, a writ of prohibition, and other extraordinary and equitable relief against Baker, the SDEC, the Pikes, Baxley, and members of the subcommittee appointed by Baker to hear the contest. The petition sought to halt the election contest proceeding and all discovery by Baxley. Judge Jack Carl issued ex parte a temporary restraining order forbidding the SDEC from holding hearings on the contests and stopping depositions scheduled by Baxley. The other defendants were likewise enjoined. The court set a hearing on the petition on July 29. This Court issued an order staying the temporary restraining order and requiring Judge Carl to conclude the matter and issue a final order by 5 p.m. on July 31. On July 31, Judge Carl entered a judgment finding in favor of Graddick and against the defendants.
The defendants appealed this judgment and also filed a motion to vacate the judgment.
*690 Judge Carl made no findings of fact nor did he state any conclusions of law. He merely held in favor of Graddick. Graddick's petition sought to halt the election contest proceeding before the SDEC subcommittee on four grounds.

I.
First, Graddick contends that the contests were untimely under Code 1975, § 17-16-70 (amended 1979), which provides that "all nominations made by primary election may be contested within 24 hours after the results of the primary election have been declared, weekends excluded...."
The Baxley Contest. Graddick argues that the 24-hour period for contesting the election commenced at the time Baker announced the results of the tally on Saturday, June 28, and that Baxley's contest filed on July 1 came too late. We reject that argument. Baker's announcement of the results of the tally of the returns is not the declaration required by the governing statute. Code 1975, § 17-16-70 requires, and all parties agree, that contests of primary elections must be made "within 24 hours after the results of the primary election have been declared...." Section 17-16-35 requires that the final results of a primary election be declared not later than noon on the Monday following the primary election, at which time "the state executive committee ... shall meet at the state Capitol in Montgomery and receive said returns... and publicly declare on that day the results thereof...." Thus, the SDEC is required to make a public declaration of the results. The chairman appointed a subcommittee of the SDEC, which did meet in the Secretary of State's office at the state Capitol at noon on Monday, June 30. It filed a declaration at that time. The nominee for office of Governor was not certified, but the document explained that because a contest had been filed and not resolved, a nominee was not certified and no vote totals were stated. Baker testified that legal counsel had advised this course of action. Inasmuch as the total figures had been previously publicly announced, we hold that this substantially complies with § 17-16-35. This statute and § 17-16-70 must be read in pari materia. Doing so eliminates uncertainty which could result from statements made by the chairman and establishes a time certain for the commencement of the 24 hours in which to contest a primary election. We hold that Baxley's contest is timely, having been filed within 24 hours of the declaration of the result.
The Pike Contest. Graddick argues that this contest is untimely because he says it was prematurely filed. We agree that it was prematurely filed but do not agree that this destroyed its effect. It remained filed and was on file with the SDEC when the formal declaration was made as required by § 17-16-35. Therefore, it too was timely. There is no requirement that a pleading, although prematurely filed, be re-filed if it is on file at the time required for filing. See Foster v. Greer & Sons, Inc., 446 So.2d 605 (Ala. 1984).

II.
Graddick next contends that the SDEC has not complied with § 17-16-85, and, therefore, that it has lost jurisdiction to hear the contest. He says that the statute requires that the contest be heard and decided not less than 10 nor more than 20 days after the contest is filed. Section 17-16-85, in its entirety, provides:
"The state executive committee shall, upon the filing of a contest with the chairman, be called by such chairman to meet at a time not less than 10 days nor more than 20 days from the time of filing such contest for the purpose of hearing and determining the same, or without calling the committee to meet, the chairman may appoint a subcommittee as herein provided for."
This statute authorizes the chairman either to call a meeting of the state executive committee to meet not less than 10 days nor more than 20 days to hear the contest *691 or to appoint a subcommittee. In this case, the chairman appointed a subcommittee 2 days after the Pike contest was filed; the subcommittee met on July 14, which is more than 10 days and less than 20 days from the date the contests were filed. Since that time, the committee has scheduled other hearings. Any delay in conducting these hearings has in large part been caused by court orders obtained by Graddick and issued by the trial court without authority and in express violation of statutory and case law. Code 1975, § 17-15-6; State v. Albritton, 251 Ala. 422, 37 So.2d 640 (1948); Ex parte State ex rel. Tucker, 236 Ala. 284, 181 So. 761 (1938).
Perloff v. Edington, 293 Ala. 277, 302 So.2d 92 (1974), held that in a primary election contest it is mandatory that the chairman comply with § 17-16-85 by setting the date for the subcommittee to hear the contest. Here, the chairman did so. The contest was filed on July 1. A hearing was set for July 14. That hearing was held and others were scheduled. In Perloff, the Court stated:
"After that initial meeting, the schedule of hearings and proceedings may be set by the committee and the interested parties, but the time limit is jurisdictional because there can be no contest until the hearings begin and the first hearing must be held within twenty days after the filing of the contest." (Emphasis added.)
293 Ala. at 281, 302 So.2d at 96.
This has been done here. Obviously, the legislature could not have intended to require that all primary election contests be concluded within twenty days of the filing of the contest. Many of our cases have commented on the obvious desirability of resolving such matters as expeditiously as possible, but it is certainly not mandated that the entire matter be determined within 20 days.

III.
Graddick next argues that the SDEC is without authority to act through subcommittees in election contests because Title 17, § 394, of the 1940 Code, which expressly authorized the appointment of a subcommittee, is no longer in the Alabama Code. This argument is without merit.
Prior to 1975, Alabama law provided:
"The state executive committee ... of any political party shall have the right, power, and authority to appoint, or to authorize and empower the chairman thereof to appoint ... a subcommittee... to hear, consider, and decide any contest of any election ... and generally to delegate to and confer upon such subcommittee the right, power, and authority to do and perform any act or thing which such executive committee could do or perform. The chairman of a subcommittee shall also have and be authorized to perform any act, and exercise any power or authority which the chairman of such executive committee has or could exercise under this chapter."
Code 1940, Title 17, § 394. Section 394 was enacted in 1931, along with the other provisions now at Code 1975, § 17-16-70 et seq. (Article 2, "Contests of Elections"). The statute also appeared in the 1958 Recompiled version of the 1940 Code and in the 1973 Cumulative Pocket Part to that code. This Court had upheld and construed § 394 in several cases. See, e.g., Bridges v. McCorvey, 254 Ala. 677, 49 So.2d 546 (1950); Prather v. Ray, 258 Ala. 106, 61 So.2d 46 (1952); Ex parte Skidmore, 277 Ala. 221, 168 So.2d 483 (1964). The legislature, however, repealed § 394 in 1975.
Nonetheless, according to the 1975 Code, a subcommittee may still be appointed to hear primary election contests. Code 1975, § 17-16-85, provides:
"The state executive committee shall, upon the filing of a contest with the chairman, be called by such chairman ... for the purpose of hearing and determining the same, or, without calling the committee to meet, the chairman may appoint a subcommittee as herein provided for." (Emphasis added.)
We note that while repealed § 394 authorized the executive committee either to *692 appoint subcommittees to hear primary election contests or to empower the chairman to do so, Code 1975, § 17-16-85, directly authorizes the chairman to appoint such a subcommittee. Furthermore, several of the contest statutes in the 1975 Code still refer to such a subcommittee. Code 1975, § 17-16-74, provides:
"In the hearing of any contest before any committee or subcommittee under the provisions of this article, such committee... shall have authority to summon witnesses to appear before it, or before any subcommittee appointed by it, in the hearing of any contest pending before such committee...." (Emphasis added.)
Code 1975, § 17-16-76, provides:
"The chairman of any committee or subcommittee before which may be pending any contest as herein provided shall have authority to administer oaths to witnesses in such contests and to summon persons and officers to be and appear before such committee or subcommittee...." (Emphasis added.)
Code 1975, § 17-16-84, provides:
"... It shall be the duty of the sheriff to serve all process issued by the circuit clerk and execute all orders and processes of the executive committee or subcommittee trying the contest. Such executive committee or subcommittee shall have the same power and authority as the circuit judges of this state to enforce obedience to its orders.... Such executive committee or subcommittee shall... have the power to require any person to produce before it papers or documents pertinent to any inquiry before such executive committee or subcommittee." (Emphasis added.)
Therefore, we hold that § 17-16-85 provides sufficient statutory authority for the appointment of a subcommittee to hear the contest.

IV.
The legislature has granted the exclusive jurisdiction to hear such primary election contests to the political party which conducts the primary. Once a contest is filed with that party, invoking its jurisdiction, the courts are without authority to intervene. In Ex parte State ex rel. Bragg, 240 Ala. 80, 197 So. 32 (1940), this Court held that where a contest of a primary election alleged that illegal votes were cast, such an allegation was sufficient to invoke the jurisdiction of the political party and its jurisdiction was exclusive. The Court stated:
"In the matter of contests of primary elections the Legislature has deemed it wise to commit same to party tribunals. This is in recognition of the interest and concern which the party, the associated group of citizens acting together as such, have in the selection of their political representatives, put forward as nominees, recommended for election to public office. The courts scrupulously avoid interfering with political action of this sort. Smith v. McQueen, 232 Ala. 90, 166 So. 788; Lett v. Dennis, Chairman, etc., 221 Ala. 432, 129 So. 33.
"Clearly enough, and it does not seem to be questioned, that if the Executive Committee has jurisdiction of this contest, the circuit court has no jurisdiction to interfere with its exercise of that jurisdiction. Since we hold the committee has acquired jurisdiction, it follows the circuit court is without jurisdiction to entertain and grant the relief sought by contestee.
"But, it is said the circuit court had the right to pass upon the question of its jurisdiction; that the rule nisi was properly issued to give a hearing on that question; that presumably a correct ruling will be made; and this court should not intervene in advance of a hearing in the circuit court.
"Such is the general rule. Ex Parte Boothe et al., 64 Ala. 312. But such rule has exceptions. Its application is a matter of discretion, as justice shall indicate. Ex Parte State ex rel. Knight, Attorney General, 229 Ala. 513, 516, 158 So. 317. Such rule cannot be invoked where by an ex parte order the circuit court has denied *693 the like power of the committee to pass on its jurisdiction in due course.
"The circuit judge has already entered a restraining order forbidding the committee to hear the contest within the time contemplated by the statute, and to await his decision whether he will prohibit all further action by the committee.
"He had no jurisdiction thus to interfere with the contest before the subcommittee. His order was void; the petition presented to him conferred no jurisdiction to enter any order interfering with the proceedings by the committee. He can make no valid order in the proceedings before him save to dismiss it. Prohibition is the proper remedy to intercept and put an end to usurpation of jurisdiction. Ex Parte State ex rel. Bailes, 235 Ala. 133, 177 So. 752; Ex Parte Blue, 218 Ala. 113, 118 So. 147; Strother et al. v. McCord, Circuit Judge, 222 Ala. 450, 132 So. 717."
240 Ala. at 85, 197 So. at 36.
The case before us is indistinguishable and we hold that because the SDEC had acquired exclusive jurisdiction of this contest, the circuit court was without authority to enjoin its proceedings. See Ex parte Skidmore, 277 Ala. 221, 168 So.2d 483 (1964).
For over 50 years, the courts in this state have adhered to the legislative mandate that political parties are empowered to settle their own disputes in primary elections. The same rules apply regardless of the office involved. The statutory scheme was first enacted in 1931 and bestowed on political parties in primary election contests subpoena power and prehearing discovery authority which the circuit courts did not have for 40-odd years thereafter. The legislature recognized that these disputes require an early resolution and it gave the political parties the tools to resolve them. It vested in political parties in primary disputes quasi-judicial authority and such discretion as courts of limited jurisdiction exercise. The legislature intended to make it difficult to win primary election contests, but not impossible, and it certainly gave the parties to the contest a right to be heard.
We are aware of the remedy fashioned by the three-judge federal court under the Voting Rights Act, 42 U.S.C. § 1973c, in Henderson v. Graddick, 641 F.Supp. 1192 (1986, M.D.Ala.). Also, Alabama Code, § 17-16-87, authorizes the following:
"If, upon hearing of any contest for any office, as provided for in this article, the committee, after an investigation and hearing of the contest, shall determine that it is impossible from the evidence before it to decide who is the legally nominated candidate for the office contested, it shall have the right and authority to direct a new primary for the nomination to any such office."
We vacate the judgment of the trial court and direct the SDEC to proceed with a resolution of this matter without further delay.
JUDGMENT VACATED.
JONES, ALMON, SHORES, ADAMS and STEAGALL, JJ., concur.
TORBERT, C.J., concurs specially with opinion in which HOUSTON, J., concurs.
MADDOX, J., concurs specially.
BEATTY, J., not sitting.
TORBERT, Chief Justice (concurring specially).
I concur in the resolution of the issues addressed by the majority of this Court, but write separately on what I consider to be the issues critical to a speedy, final determination of this important affair of state. These issues were presented to the trial court in the petition before it, and were clearly presented and addressed in briefs of both Appellant Baxley and Appellee Graddick.
The courts of this state have been called upon almost continuously, since shortly before the second Democratic primary held on June 24, 1986, up to these instant proceedings, to become involved in this controversy. In addition, the jurisdiction of the *694 federal judicial system was invoked to resolve matters within its jurisdiction under the Federal Voting Rights Act of 1965.[1]
Perhaps the best summary as to the jurisdiction and role of state courts in primary election contests is set forth in the case of Perloff v. Edington, 293 Ala. 277, 302 So.2d 92 (1974), in an opinion by Justice Merrill, joined by Justices Harwood, Maddox, McCall, and Faulkner:
"The Legislature has given the handling of political party nominations to the several political parties, even to the decision as to whether the party will nominate its candidates by primary elections or conventions. Tit. 17, § 336 [Ala.Code 1940].
"To insure that political parties would not be bothered in the handling of their nominating elections and the contests arising therein, as well as other elections of persons to office, courts have no jurisdiction except that `specially and specifically enumerated and set down by statute.' Tit. 17, § 235. This court has followed the statute in Ex parte Skidmore, 277 Ala. 221, 168 So.2d 483, and the cases therein cited.
"In effect, the Legislature has said that political parties can run their party affairs without interruption by the courts, but those affairs must be run within the rules laid down by the Legislature.
"One of the reasons for this rule in election contests is that time is of the essence in an election contest. The party committee, or its subcommittee, can act more speedily than the courts and can devote its time to one contest, where [whereas] the courts are occupied with all types of litigation.
"The right to contest an election is given by virtue of the statutes and `it must be instituted and presented within the "jurisdiction" etc., and as prescribed by law, and by a person so authorized.' Garrett v. Cuninghame, 211 Ala. 430, 100 So. 845.
"In Pearson v. Alverson, 160 Ala. 265, 49 So. 756, the court stated:
"`Election contests are special statutory proceedings, and, according to the best authorities, which have been followed by our own court, are to be strictly construed as to those provisions for inaugurating the contest, and which are necessary to jurisdiction. A short time limit is fixed, because it is important that such matters should be determined as speedily as possible for the public good. It is accordingly held that, if the petition is defective as to any of the statutory requirements, it cannot be amended after the expiration of the time limited for commencing the contest. To construe the law otherwise would render the time limit of the statute ineffective. The giving of security according to the statute is also a jurisdictional requirement....'
"...
"... If the committee or the chairman fail or refuse to follow the mandates of the statutes, the only recourse of either the contestant or the contestee is to the courts. In such cases, the courts are open.
"The court was open to both the candidate and the committee in Butler v. *695 Amos, 292 Ala. 260, 292 So.2d 645, where both parties sought a construction and application of § 47, Constitution of Alabama 1901. The courts were also open to the candidate and the committee in Hobbie v. Vance, 292 Ala. 367, 294 So.2d 743, where one of the main questions was the construction and application of the liner statute, Tit. 17, §§ 18, 19, when that statute had been misconstrued in an opinion of the Attorney General requested by the candidate."
Perloff, 293 Ala. at 279, 281; 302 So.2d at 94-96.
This Court and our trial courts have acted promptly on matters presented by the various parties to this contest. The second (or runoff) primary election was held June 24, 1986, and the two contests were filed and proceedings commenced within the time frame allowed by law. Delays in the proceedings were occasioned by the action of both principal parties by asking for a continuance before the committee (Baxley) and by the initiation of court actions (Graddick).
In an effort to conclude the involvement of our courts in this matter, this Court entered an order (on July 29, 1986) requiring the trial court to "forthwith issue a judgment on the merits of the petition of Charles A. Graddick filed in that court on July 24, 1986." The order required the trial court to conclude the case on the merits no later than 5:00 p.m. on July 31, 1986. The trial court, under obvious time constraints, held a hearing on the merits on the morning of July 31, 1986, and entered its judgment that afternoon finding in favor of Graddick. Appeals were taken to this Court that same day. The appeals were expedited, briefs were filed, and the case submitted August 6, 1986. Oral argument was requested, but denied by a majority of this Court. Because of the importance of these matters, it is my view that oral argument was appropriate so that both the parties and the Court could more clearly define the issues and the arguments. Accordingly, the decision of this Court is rendered without benefit of oral argument.
"The right to vote in a democracy is among the most precious of all individuals' rights. It is a mechanism which individuals can and do use to hold officeholders accountable even when other parts of the political process fail to produce accountability. For one's vote, when cast, to be translated into a true message to officeholders and candidates, that vote must be accurately counted, and if necessary, recounted at every stage of the election process. The moment an individual's vote becomes subject to error in the vote tabulation process, the easier it is for one's vote to be diluted."
1 Institute for Research in Public Safety, Indiana University School of Public and Environmental Affairs, Contested Elections and Recounts: The Federal Perspective, 3 (1978).
Our legislature has, over the years, enacted laws to insure a fair, free and full exercise of the elective franchise. Corrupt practices have been defined and sanctions provided, Code 1975, § 17-22-1 through § 17-22-15. Criminal offenses have been established and penalties prescribed, Code 1975, § 17-23-1 through § 17-23-11.
The legislature has carefully constructed a statutory scheme to insure that an accurate vote count is obtained in order to give full effect to one's right to vote. Code 1975, § 17-16-31 and -32; Code 1975, § 17-13-1 through § 17-13-11. See also, Code 1975, § 17-14-20 through § 17-14-27.
Having taken great pains to insure an accurate, valid count of the votes in an election, the legislature by statute has provided for election contests. Code 1975, § 17-16-70 through § 17-16-89 (applicable to primary elections).
The intent of the legislature is clear. Six grounds for the contest of the nomination by a political party are specifically set-out by law. Code 1975, § 17-16-71(1) through (6). The legislature further provided that where the contest involved the receipt of illegal votes or the rejection of legal votes, no testimony (evidence) shall be received unless the complaining party has given to *696 the adverse party five (5) days written notice "of the number of illegal votes and by whom given, for whom given and at what precinct or voting place cast, or the number of legal votes rejected, by whom offered and at what precinct or voting place they were not allowed to be cast, which he expects to prove on the trial." Code 1975, § 17-16-79.
From the record in this appeal, it is plain that one of the determinative issues raised by this contest involves the interpretation and application of the notice provisions of Code 1975, § 17-16-79. This is the issue as to illegal votes cast. My review of the record, as well as the briefs, shows that each party to this contest, including the subcommittee itself, recognizes this issue. It appears to me that the legislature intended, and our cases clearly hold, that § 17-16-79 is to be strictly construed and applied. Carter v. Wiley, 406 So.2d 340 (Ala.1981); Turner v. Cooper, 347 So.2d 1339 (Ala.1977).
I believe that there is a logical relationship between the sufficiency of the evidence necessary to prove an election contest and the sufficiency of the notice required. An intent to require specific evidence can be gleaned from the fact that under Code 1975, § 17-16-87, the party must hold a new election in the event the committee is unable to decide who was the legally nominated candidate. Apparently, the legislature concluded that it was preferable to have another election than have the outcome of the contested election determined on inconclusive, insufficient, or contradictory evidence.[2]
Therefore, a vote that has been counted for a person declared nominated should be nullified only upon evidence proved to the reasonable satisfaction of the body trying the contest that the particular person or persons voted illegally and for whom that person or persons voted. To state it plainly, the committee trying the contest, on the basis of illegal votes cast, should simply be sure that the person initially declared to be the winner of the runoff election did not receive the number of legal votes necessary for nomination.
It follows that the written notice of the evidence that the contestant intends to present in order to prove the illegal votes must be specific.[3] There is no point in conducting a contest hearing seeking to declare someone else the nominee if the contestant is unable to provide the notice of the testimony or evidence which is required to nullify the allegedly illegal votes. Turner v. Cooper, supra.[4]
*697 That is not to say that the inquiry of the committee in this contest must necessarily be ended. As previously noted, the legislature wisely provided by law that on the hearing of any contest of any election, if the committee determines it is not possible from the evidence before it to decide who is the legally nominated candidate, it has the right and authority to direct a new primary election for the nomination to that office. Code 1975, § 17-16-87. Thus, it appears to me that the legislature has given the authority to a political party to call a new election on the basis of malconduct under § 17-16-71(1), (5), or (6) where such malconduct so tainted an election as to prevent the party from making a determination as to the legally nominated candidate.
HOUSTON, J., concurs.
MADDOX, Justice (concurring specially).
Even though the majority opinion sets out many of the facts and addresses several of the jurisdictional issues, I file this separate opinion to state my views regarding the present posture of this particular election contest.
This case involves two primary election contests of the results of the Democratic gubernatorial runoff held June 24, 1986, and whether the State Democratic Executive Committee (SDEC) and its Subcommittee, composed of defendants Baker, Blount, Boggan, Kellett, and Knight, have jurisdiction to hear and determine the contests.
The specific issues are:
(1) Whether the two election contests were filed within 24 hours after the "public declaration" of the second primary election, as required by Code 1975, §§ 17-16-35 and 36.
(2) Whether the SDEC could appoint a subcommittee to hear and determine the contests.
(3) Whether the SDEC heard the contests not less than 10 nor more than 20 days after the election contests were filed, as required by Code 1975, § 17-16-85.
(4) Whether the contestants complied with the provisions of Code 1975, § 17-16-79, which provides, in part, that "No testimony shall be received of any illegal votes or of the rejection of any legal votes in any contest commenced under the provisions of this article unless the party complaining thereof has given to the adverse party notice in writing of the number of illegal votes and by whom given, for whom given, and at what precinct or voting place cast, or the number of legal votes rejected, by whom offered and at what precinct or voting place they were not allowed to be cast, which he expects to prove on the trial."
(5) Whether the contestants can prove at any future hearing of the contests that alleged "illegal votes" affected the outcome of the second primary election by use of opinion and polling evidence.
(6) Whether the federal Voting Rights Act applies to a decision of this Court which construes the primary election laws of the state and the rules and regulations promulgated by the SDEC adopted under authority of state law.
The trial court made no findings of fact, but in its order entered pursuant to this Court's mandate in Ex parte Baxley, docket no. 85-1242, July 29, 1986 (unpublished order), "that the Circuit Court of Jefferson County shall forthwith issue its judgment on the merits of the petition of Charles A. Graddick filed with that court on July 24, 1986, no later than 5:00 p.m. on July 31, 1986," did enter an order in which he made a finding, in part, as follows:
"The Court finds in favor of the Plaintiff, Charles A. Graddick, and against Defendants, John Baker, individually and as Chairman, State Democratic Executive Committee; State Democratic Executive Committee, a body politic; Charles Kennith Pike; Nellie Kent Pike; William J. Baxley; William B. Blount; Jack Boggan; Franklin Kellett; John Knight; and Alabama Democratic Party."
Even though the trial judge made no specific findings of fact based upon the evidence presented before him on July 29, 1986, and July 31, 1986, in connection with *698 this proceeding, the tendencies of the evidence are as follows:
In the second Democratic primary election, held on June 24, 1986 (the "runoff"), contestee Charles A. Graddick received 470,051 votes, and contestant William J. Baxley received 461,295 votes according to the accounting firm retained to achieve the vote tally. The SDEC retained the accounting firm of Coopers & Lybrand to conduct a tally of the votes cast in the runoff. The managing partner of Coopers & Lybrand was present at the City Council Chambers in the Birmingham City Hall on Saturday, June 28, 1986, when about 1:30 p.m. he presented the official vote tally to defendant John Baker, chairman of the SDEC, which tally contained the votes cast in the runoff for the gubernatorial race: 470,051 for Graddick; 461,295 for Baxley. On that day, representatives of the Baxley campaign, the Graddick campaign, and the media were present in the City Council chambers. After being presented with this vote count by Coopers & Lybrand, Baker stated the results of that race at approximately 1:30 p.m., June 28, 1986. A news reporter present testified at the hearing, as follows:
"Q. What if anything did Mr. Baker do with the results?
"A. Mr. Baker approached one of the tables below where the council sits, and opened up a binder, and read a statement in which he declared the results that the accountants had come up with to be the official results of the runoff election."
On Monday, June 30, 1986, a subcommittee of the SDEC met in the Secretary of State's office in Montgomery. According to the minutes of their meeting, which have been signed by all the members of this subcommittee and certified by the Secretary of State, this subcommittee was appointed for the "purpose of supervising the holding of the Democratic Party elections * * * including the canvassing of and the declaration of the results * * * and the certification of nominees." The minutes, in part, state that the subcommittee, "[D]oes now publicly declare the results of said Primary Elections to all offices, except County Offices, to be as shown in the Tabulation of Returns attached hereto and made a part hereof by reference."
The tabulation attached to the minutes shows that no results were given for the gubernatorial runoff. These minutes did contain the official vote count established by Coopers and Lybrand in the runoff for the candidates for the lieutenant governor's race: 517,724 for Folsom; 382,836 for Teague.
The record does not disclose precisely when or how the subcommittee to hear the election contests was appointed, but Baker testified that he appointed a subcommittee to declare the election results in the gubernatorial runoff and that this subcommittee declared the results of the election in the office of the Secretary of State on June 30, 1986. Baker, as chairman of the SDEC did appoint defendants William B. Blount, Jack Boggan, Franklin Kellett, John Knight, and himself, as chairman, to a subcommittee for hearing the election contests (the "Subcommittee").
The Rules of the Democratic Party provide in Art. VIII, Sec. 2, that the filing of a statement of contest is deemed complete when personally delivered to the Chairman and that he shall endorse thereon the date it is filed with him. The contest of Charles Kennith Pike and Nellie Kent Pike was delivered by their attorney to Baker at the City Council chambers in Birmingham at 10:28 a.m. on Saturday, June 28, 1986; Baker endorsed thereon the date and time. The contest of William J. Baxley was filed at 9:30 a.m. on July 1, 1986. On July 3, 1986, the Pikes filed an amendment to their contest, which added additional grounds of contest not alleged in their initial filing.
On July 1, 1986, a preliminary meeting in the contest matter was held in Montgomery, at which hearing counsel for Baxley, the Pikes, and Graddick were present. Baker presided at this meeting. At this meeting, the first hearing was set for July 14, 1986. At this meeting on July 1, Graddick filed a motion to dismiss both contests for failure to file within the statutorily *699 prescribed twenty-four hours after the public declaration, weekends excluded. Graddick also filed a motion to dismiss based upon the failure of the contestants to challenge the alleged illegal votes prior to, or in conjunction with, their being cast.
Graddick filed six motions for relief on July 10, 1986, in which he contended (1) that the contestants had failed to serve on him, within five days of the scheduled July 14 hearing, a written notice of the number of illegal votes and by whom cast, for whom cast, and at what place cast, that they expected to prove, as required by § 17-16-79, Code 1975, and (2) that the subcommittee could not conduct the July 14, 1986 hearing. At the commencement of the July 14, 1986, hearing, Graddick objected to the hearing on the grounds that he had not been served with the five-day notice. The hearing consisted of opening statements by counsel and the limited testimony of each of the contestants as to his/her name, address, voting place, and other qualifications to bring the contest. Prior to the close of the hearing, Graddick objected to an adjournment.
In his opening statement at this hearing, attorney Johnson, counsel for contestant Baxley, stated in part: "We are strictly talking about illegal votes ... so when we talk about party registration and we talk about the real issues involved in this case, we should keep an eye on this fact, that we are only talking about illegal voting ... and we will prove that the crossover vote affected the outcome of the election."
Attorney Still, co-counsel for Baxley, was called to the stand by Baxley to testify at the hearing in this case held before the trial court on July 31, 1986. On cross-examination, he testified:
"Q. (MR. McWHORTER) But it is your position, is it not, that this alleged malconduct resulted in the casting of illegal votes?
"A. (MR. STILL) Yes.
"Q. That's the bottom line, isn't it?
"A. That's right. Charles Graddick went out and told people they could vote illegally and they did.
"* * *
"Q. And with respect to illegal votes, do you conceive as a lawyer that motive has anything to do with the illegal votes?
"A. The motive of the person casting the illegal vote?
"Q. Yes.
"A. No, it doesn't have anything to do with it. A vote's illegal if it's illegal.
"Q. That's right. And motive has nothing to do with it, does it?
"A. Not on the part of the person casting the ballot.
"Q. And whatever outside impetus resulted in the casting of the illegal vote, the vote is nevertheless illegal, is that your position?
"A. It is illegal if it's contrary to law; that's correct.
"Q. Irrespective of whatever operated to create the casting of that vote?
"A. That's right."
At the July 14, 1986, contest hearing, Baxley filed a motion to continue. Graddick objected to this motion. The motion was granted and the contest was continued from July 21 to July 28 to allow Baxley, as stated in his motion, more time to develop the evidence of the number of alleged illegal votes.
Baxley requested the issuance of deposition subpoenas for depositions to take place on July 23, July 24, and July 25. Graddick filed a motion to quash these subpoenas, or, in the alternative, for a protective order on the ground that the five-day notice required by § 17-16-79 to be given before any testimony may be taken in reference to alleged illegal votes had not been given. This motion was denied. Graddick also filed a motion to stay these depositions until Baxley presented substantial evidence to show that there were enough alleged illegal votes to make a difference in the outcome of the election. This motion was denied. Baxley then rescheduled the depositions to commence on July 24, 1986.
A substantive hearing on the election contests was set for July 28, 1986. Graddick contended that compliance by contestants *700 with the five-day notice provision would require service of that notice on him on Wednesday, July 23, and that no such notice was served on July 23, or even thereafter. Graddick contended that, as of that date, the SDEC had refused to rule on any of his motions relating to the failure of the contestants to supply the five-day notice prior to the taking of testimony at a hearing in reference to alleged illegal votes, and had ruled that the taking of testimony by deposition could go forward without the notice having been given. He further contended that the contestants had never served or presented any notice of the evidence expected to be produced in support of the grounds of their respective contests.
Graddick filed his "Verified Petition for a Temporary Restraining Order, Writ of Prohibition And Other Extraordinary and Equitable Relief" (the "Verified Petition") on Thursday morning, July 24, 1986, before the Honorable Jack Carl, and requested the following relief:
"REQUEST FOR GENERAL RELIEF
"D. Issuing an appropriate writ of mandamus, or writ of prohibition, or other appropriate order, directed to the SDEC and the Subcommittee to compel them to dismiss the contests or to prohibit them from hearing the contests on the grounds that each are without jurisdiction to hear and determine the contests for any or all of the following reasons:
"(1) The Pike contest, the Baxley contest and the amendment to the Pike contest, separately and severally, were not filed within 24 hours of the public declaration of the results of the runoff;
"(2) No substantive hearing has been held not less than 10 nor more than 20 days from the filing of the respective contests;
"(3) There is no legal authority for these contests to be heard by the Subcommittee, and the SDEC has held no hearing not less than 10 nor more than 20 days from the filing of the respective contests;
"(4) Neither the SDEC nor the Subcommittee has any power or authority to proceed with the contests because the contestants have failed to comply with the five-day notice requirement.
"ALTERNATIVE SECONDARY REQUEST FOR RELIEF
"E. Alternatively, and only in the event the relief in foregoing paragraph `D' is denied, the plaintiff respectfully prays for an appropriate order, judgment and decree finding and ordering:
"(1) That the contestants must comply with the provisions of § 17-16-79 by giving to Graddick written notice of the specific number of alleged illegal votes and by whom given, for whom given, and at what voting place cast at least five days before the contestants can proceed to present any evidence of their alleged grounds of contest or any evidence respecting illegal votes in any way;
"(2) That if contestants intend or seek to prove any alleged illegal votes in these election contests, they must provide the written notice specified by the provisions of § 17-16-79;
"(3) That the contestants have the burden in this election contest of proving the alleged illegal votes on an individual, vote-by-vote basis and are not permitted under the law of Alabama to prove such alleged illegal votes by expert opinion testimony based on polling, statistics, or the like;
"(4) That the contestants are not entitled to proceed with the scheduled depositions until five (5) days after effecting service of the notice required by § 17-16-79."
A separate proceeding concerning the gubernatorial election had been filed in the United States District Court for the Middle District of Alabama, Henderson v. Graddick, 641 F.Supp. 1192 (1986 M.D.Ala.). The court, in that case, entered an order which read, in part, as follows:
"In accordance with the memorandum opinion entered contemporaneously herewith, it is ORDERED, ADJUDGED and DECREED:
"1. That a plaintiff class of all black, registered voters who voted in both the *701 June 3 Democratic primary and June 24 Democratic runoff is hereby certified.
"2. That by preventing the Democratic party of Alabama from enforcing its rule prohibiting crossover voting in the June 24, 1986, gubernatorial runoff and by actively encouraging the violation of the Democratic Party's anti-crossover rule without first receiving `preclearance' of such actions, defendant Charles Graddick violated Section 5 of the Voting Rights Act of 1965.
"3. That defendant Charles Graddick and his successors are hereby enjoined from seeking to administer any change in the Democratic Party rule prohibiting crossover voting without following the procedures prescribed by Section 5 of the Voting Rights Act for effecting such a change.
"4. That the Alabama State Democratic Executive Committee and John Baker are hereby enjoined from certifying Charles Graddick as the Democratic gubernatorial nominee based on the results of the June 24, 1986 Democratic runoff.
"5. That the State Democratic Executive Committee and John Baker are mandatorily enjoined and directed to order a new runoff election between Mr. Graddick and Mr. Baxley unless the Democratic Party determines pursuant to its procedures and the stringent rules under Alabama law for an election contest that Mr. Baxley received the majority of the legally cast votes in the June 24 runoff.

"6. That if a new runoff election is held, no person who voted in the June 3 Republican primary will be allowed to vote, and the following procedure will be used by all election officials to determine who shall be allowed to vote:
"(1) Each voter shall be asked, `Did you vote in the Republican primary on June 3?'
"(2) If the answer is `Yes,' that person shall not be allowed to vote in the Democratic runoff.
"(3) If the answer is `No,' that person shall be allowed to vote.
"(4) If the voter refuses to answer, he shall not be allowed to vote because he is refusing to comply with the rules of the Democratic Party.
"(5) If a person who is not allowed to vote for refusal to answer insists upon voting in violation of state law and Democratic Party rules, he may vote a challenge ballot if requested.
"This Court hereby retains jurisdiction of this case to award any further or other relief that is necessary. For the purpose of determining costs and attorney's fees, this cause is remanded to the one judge initiating district court." (Emphasis added..)
In brief, on this appeal, Graddick states:
"The time for post-trial motions has not yet run in that action. The conduct attributed to Graddick in Henderson was based upon legal conclusions which Graddick rejects, factual findings which are in sharp dispute; and the case, of course, was decided upon a civil standard of proof on an accelerated hearing schedule."
I have done extensive research on the question of whether the contests were timely filed, whether the SDEC could appoint a subcommittee to hear the contest, and whether the hearing was held as required by law, and I am of the opinion that there is some merit in each, if not all, of these claims, but I do not address them; however, by not addressing them, I do not concede that the statutory requirements were met. This is the first proceeding in which the jurisdictional claims of the contestee have been presented before a court. This Court has been called upon to decide some peripheral questions, and while the validity vel non of the "crossover rule" itself, and the jurisdictional claims now presented here were made before the subcommittee, and are contained in some of those proceedings, we are far down the road now, and many events have intervened, including a decision in Henderson v. *702 Graddick, wherein the "crossover rule" was the crucial issue.
At this stage of the proceedings in this case, and in order to decide the issues in this appeal, I am of the opinion that implicit in the federal case of Henderson v. Graddick is a conclusion that the subcommittee has jurisdiction to hear the contest.
Graddick's counsel advises that the time for filing post-trial motions in that action has not expired. If not changed or vacated by an appeal, that order is very explicit, and holds that Graddick cannot be the nominee, as a result of the June 24 election, the one here involved, but that Baxley could be declared the nominee. The Court specifically held:
"That the State Democratic Executive Committee and John Baker are mandatorily enjoined and directed to order a new runoff election between Mr. Graddick and Mr. Baxley unless the Democratic party determines pursuant to its procedures and the stringent rules under Alabama law for an election contest that Mr. Baxley received the majority of the legally cast votes in the June 24 runoff." (Emphasis added.)
I assume the "stringent rules" referred to in the order of the Henderson court are the requirements of Alabama law applicable when an allegation of "illegal votes" is the basis of the contest, as is the case herespecifically, the requirements of Code 1975, § 17-16-79, which states:
"No testimony shall be received of any illegal votes or of the rejection of any legal votes in any contest commenced under the provisions of this article unless the party complaining thereof has given to the adverse party notice in writing of the number of illegal votes and by whom given, for whom given and at what precinct or voting place cast, or the number of legal votes rejected, by whom offered and at what precinct or voting place they were not allowed to be cast, which he expects to prove on the trial."
That the requirements of § 17-16-79 should apply, and would be applied, by the subcommittee hearing the contest is shown by statements of counsel for the contestants and the SDEC, but the parties are in sharp disagreement as to whether the contestants must introduce "vote-by-vote" evidence, which they admit is a physical impossibility, or can use "survey evidence," to prove that Baxley won the June 24 election because he received the most "legal" votes.
The contestant in an election contest must give notice to the contestee of the nature of the legal votes wrongfully disallowed or illegal votes wrongfully counted, in accordance with Code 1975, § 17-16-79. Cf. Carter v. Wiley, 406 So.2d 340 (Ala. 1981); Turner v. Cooper, 347 So.2d 1339 (Ala.1977).
The parties have stated in their briefs that Mr. Baxley intends to use survey evidence to fulfill the requirements of § 17-16-79. Because of this very important jurisdictional dispute in this case, and at this point in time, there is a "justiciable controversy" which the trial court and this Court have jurisdiction to decide.
I am of the opinion that the United States District Court necessarily recognized the possibility that the contestants could not prove an accurate count, and, in its order set forth the guidelines for the conduct of another election.
My view of the Alabama law, I believe, is consistent with the order issued in Henderson v. Graddick, which, if not vacated on appeal, or otherwise changed by that court, must be enforced.
I would address the question of the legal effect of § 17-16-79, under the peculiar facts of this case, and in view of the particular stage of this proceeding.
As this Court said in Perloff v. Edington, 293 Ala. 277, 302 So.2d 92 (1974):
"The court was open to both the candidate and the committee in Butler v. Amos, 292 Ala. 260, 292 So.2d 645, where both parties sought a construction and application of § 47, Constitution of Alabama 1901. The courts were also open to the candidate and the committee in Hobbie v. Vance, 292 Ala. 367, 294 So.2d 743, where one of the main questions *703 was the construction and application of the liner statute, Tit. 17, §§ 18, 19, when that statute had been misconstrued in an opinion of the Attorney General requested by the candidate.
"The courts were open to Perloff, the announced nominee, when on July 10, 1974, he was notified that a subcommittee had been appointed to hear Buskey's contest. Two days later, Perloff filed his petition for writ of prohibition in the circuit court raising the point of lack of jurisdiction." 293 Ala. at 281, 302 So.2d at 96.
This Court, in this contest, directed the lower court to rule on the merits of the Graddick complaint, which included a request involving the legal effect of § 17-16-79, and how proof could be made of alleged "illegal votes." While the parties disagree about the legal effect of § 17-16-79, each requests that we decide it. That is the reason I would decide it. A resolution of that issue would materially speed up a resolution of this controversy, and that would be in the best interest of all the parties and the people of Alabama, and would be consistent with the settled principle of law that election contests should be speedily decided.
ADAMS, Justice (concurring):
In preparation for deliberations in this cause, I discovered for the first time that I met all of the requirements for membership in the class in Henderson v. Graddick, 641 F.Supp. 1192 (1986, M.D.Ala.). That class is defined as "all black registered voters who voted in both the June 3 Democratic primary and the June 24 Democratic runoff." Because a canon of the Alabama Canons of Judicial Ethics specifies that "a judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned," I addressed a memorandum to all attorneys of record asking that they set forth in writing whether they were of the opinion that I should disqualify myself.
My concern arose from the fact that recently the Supreme Court of the United States in Aetna Life Insurance Co. v. Lavoie, ___ U.S. ___, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), decided that a former member of this Court should not have sat in that cause because that Justice had a "direct, personal, substantial [and] pecuniary" interest in the case. That Justice had filed a class action suit against another insurance company (the class had not been certified), which had similar issues, and which was pending at the time he participated in the decision in the Lavoie case. However, the United States Supreme Court held that the other Justices were not disqualified from participating in the decision of the case because their interests were highly speculative, contingent, and not direct when compared to the interest of the other Justice.
At the time I expressed my concern, I was not aware of the fact that this same issue had been addressed in the case of In Re City of Houston, 745 F.2d 925 (5th Cir.1984). The judge involved in that case was held, under ethical canons similar to Alabama's, not to be disqualified from hearing and deciding issues in which the black judge, as here, was a member of the plaintiff class. In that case, the class was defined as all black and Mexican-American registered voters in Houston, Texas. There, the judge actually heard and decided parts of the same case in which she was a class member. The Fifth Circuit Court of Appeals held that "an interest which a judge has in common with many others in a public matter is not sufficient to disqualify him." Russell v. Wheeler, 165 Colo. 296, 439 P.2d 43 (1968); Hidalgo County Water Improvement Dist. No. 2 v. Blalock, 157 Tex. 206, 301 S.W.2d 593, 596-97 (1957); Elliott v. Scott, 119 Tex. 94, 25 S.W.2d 150, 151 (1930).
However, in order that there may be no question about my impartiality in this matter, I have taken steps to exclude myself from membership in the class in the Henderson case.
NOTES
[1] Immediately prior to the June 24 runoff election, actions were filed in the Circuit Courts of Jackson and Mobile Counties. The central purpose of both of those actions was to obtain rulings on the legality of crossover voting. Neither of the judgments obtained was appealed.

On July 11, 1986, an action was filed seeking to quash the subpoenas issued by the Democratic Party committee. On July 18, 1986, the order quashing the subpoenas was reversed by this Court.
On August 1, 1986, the federal district court in Henderson v. Graddick, 641 F.Supp. 1192 (M.D. Ala.1986), found that Graddick had violated the Voting Rights Act of 1965 and declared that Graddick could not be certified as the nominee based on the June 24 runoff election.
On July 24, 1986, Graddick filed an action seeking a temporary restraining order to stop the taking of depositions by Baxley and to stop the Democratic Party from holding a hearing in the contest. The order granting the restraining order was reversed by this Court on July 29, 1986. The order deciding the merits of the action filed July 24 is the subject of these appeals.
[2] It should also be noted that the United States District Court for the Middle District of Alabama, in Henderson v. Graddick, 641 F.Supp. 1192 (M.D.Ala.1986), was also concerned with the necessity of obtaining an accurate count. That court was concerned with the issue of the proper remedy when a violation of the Voting Rights Act of 1965 occurs. It noted, "Because the right to vote is so important, the possibility that the results of an election were changed as a result of illegal votes is enough to justify ordering a new election." The court declined to grant the relief requested by the plaintiffs. Plaintiffs sought to have the crossover votes purged on the theory that this would result in the election of Mr. Baxley. While the court noted that it was for the contest committee of the Democratic Party, and not the court, to determine the winner of the election, it is also reasonable to assume that the court's conclusion that it was "impossible for this Court to determine precisely how many crossover votes were cast, and, of course, it is impossible to know how many of these were cast for Mr. Graddick and how many for his opponent, Mr. Baxley," played a role in deciding the appropriate remedy.
[3] There is no merit in the contention that § 17-16-79 precludes discovery of evidence prior to the giving of the notice required by that section. Clearly, that section only prohibits the committee from receiving testimony, and does not prohibit the parties from discovering evidence.
[4] Mr. Baxley argues that the wrongful conduct of Mr. Graddick prevents Mr. Baxley from satisfying the requirements of § 17-16-79. "Should this court agree with Graddick that vote-by-vote testimony of all 13,000 illegal voters must be introduced, the court in effect would say that nor [sic] effective challenge can be brought against one who is massively successful in encouraging illegal voting." Baxley brief, p. 25. As discussed below, while such conduct may prevent success in a contest that seeks to have someone else declared the nominee, it does not necessarily prevent success in a contest that seeks a new election.